IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

STEFANY MICHELL GUZMAN
MARTINEZ, *et al.*,

      Plaintiffs,

      v.

UNITED STATES OF AMERICA,

      Defendant.

Case No. 2:24-cv-414

## OPINION & ORDER

Plaintiff Stefany Michell Guzman Martinez filed a complaint on behalf of herself and her minor child, A.M.B.G., against the United States, seeking compensation under the Federal Tort Claims Act (FTCA) based on allegedly tortious conduct by agents of United States Border Patrol and United States Customs and Border Protection (CBP) (collectively "immigration agents").[1] The government filed a motion to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and under Fed. R. Civ. P. 12(b)(6) for a failure to state a claim. The motion will be **GRANTED IN PART** and **DENIED IN PART**.

Counts II–V will be dismissed, but the Court will permit the plaintiffs to seek an amendment to Count IV as to A.M.B.G. only. Count VII will be dismissed as to

---

[1] The plaintiffs do not consistently differentiate between CBP and Border Patrol. Because both are executive agencies of the United States, it is not necessary at this juncture for the Court to distinguish between the two. Therefore, for the purpose of assessing sufficiency of the Complaint, the Court will refer to the actors alleged to have committed tortious acts collectively as "immigration agents."

A.M.B.G. The following claims will survive: (1) Count I, (2) Count VI, and (3) Count VII as to Plaintiff Guzman Martinez.

## I.    BACKGROUND

At this stage the Court assumes the facts alleged in the Complaint are true. Immigration agents detained Plaintiff Guzman Martinez and expelled her from the United States to Mexico on two separate occasions—first while she was eight months pregnant and second along with her two-day-old daughter, who was born in a U.S. hospital. *See* ECF No. 1 ¶¶ 2–3. Plaintiff Guzman Martinez's expulsion was carried out under an order grounded in 42 U.S.C. § 265, which allows the federal government "to prohibit, in whole or in part, the introduction of persons and property" into the U.S. in the interest of public health. *See* ECF No. 1 ¶ 6.

Count One asserts that A.M.B.G. was falsely imprisoned from her birth in a Texas hospital while her mother was in CBP custody and continuing through her expulsion to Mexico with her mother. ECF No. 1 ¶¶ 57–63; ECF No. 1–3 at 2.

In Count II, Plaintiff Guzman Martinez alleges she was falsely imprisoned in Arizona, where she was detained by CBP and expelled to Mexico on or about April 10 or 11, 2021, and in Texas, where she was detained by CBP on May 2, 2021, and held in a hospital while she gave birth to A.M.B.G., then expelled to Mexico two days later. ECF No. 1 ¶¶ 64–68; ECF No. 1–3 at 2.

In Count III, Plaintiff Guzman Martinez attempts to assert a negligence claim based on the government's failure to offer her an interview with United States

Citizenship and Immigration Services (USCIS) after she told immigration agents she was afraid of being expelled to Mexico. ECF No. 1 ¶¶ 69–75.

Count IV seeks compensation on the grounds that immigration agents expelled Plaintiff Guzman Martinez and A.M.B.G. from the United States into conditions that posed substantial risks to both individuals based on their vulnerable positions. ECF No. 1 ¶¶ 76–81.

Count V attempts to assert a negligence claim based on immigration officials retaining Plaintiff Guzman Martinez's "hospital paperwork, hospital prescriptions, a cell phone, clothes, shoes, and other personal items" when they expelled her to Mexico. ECF No. 1 ¶ 85.

In Count VI, Plaintiff Guzman Martinez alleges she suffered harm based on "medical negligence" in Arizona and Texas. According to the Complaint, while Plaintiff Guzman Martinez was in CBP custody in Arizona, the government failed to provide her with adequate medical care when she was eight months pregnant and experiencing "contraction-like pain;" instead, they required her to remain in cold, wet clothes and denied her access to food. ECF No. 1 ¶¶ 93–95. Plaintiff Guzman Martinez also alleges that in Texas, immigration agents prevented her from walking in the hospital hallways to prevent blood clots after she gave birth, forced her to walk outside barefoot two days postpartum, and failed to provide her with medication she had been prescribed. *Id.* ¶¶ 48–51, 89, 93.

Count VII asserts intentional infliction of emotional distress claims on behalf of both plaintiffs. ECF No. 1 ¶¶ 97–100.

## II.    LEGAL STANDARDS

### A.    Motions to Dismiss Under Fed. R. Civ. P. 12(b)(1)

Under Fed. R. Civ. P. 12(b)(1), a defendant can challenge the court's subject matter jurisdiction in either of two ways: (1) by contending that the complaint fails to include allegations that could establish subject matter jurisdiction or (2) by arguing the jurisdictional allegations in the complaint are not true. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). When the defendant asserts the complaint fails to allege a factual basis for subject matter jurisdiction, the court's analysis mirrors its Rule 12(b)(6) analysis, and the relevant inquiry is whether the facts alleged in the complaint, taken as true, are sufficient to invoke subject matter jurisdiction. *Id.* If the defendant challenges the veracity of the complaint's factual basis for subject matter jurisdiction, the court may go beyond the allegations within the complaint to determine whether there are facts to support jurisdiction. *Id.*

### B.    Motions to Dismiss Under Fed. R. Civ. P. 12(b)(6)

"To survive a [Fed. R. Civ. P. 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In other words, a plaintiff must plead sufficient "factual content [that] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663 (quoting *Twombly*, 550 U.S. at 556). "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 545. When considering a motion to

4

dismiss, the court "must take all the factual allegations in the complaint as true," but the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

## III.    ANALYSIS

### A.    Subject Matter Jurisdiction

The United States is generally immune from civil suits, so a plaintiff may only file a tort claim against the United States in circumstances where the government, under the FTCA, has waived its sovereign immunity. *Blanco Ayala v. United States*, 982 F.3d 209, 214 (4th Cir. 2020). The FTCA's immunity waiver is limited by a list of specific exceptions. *Id.* To allege that a federal court has jurisdiction over a plaintiff's tort claim against the United States, therefore, the plaintiff bears the burden of pleading that the exceptions to the FTCA's waiver do not apply. *See id.* The government contends that the Court lacks subject matter jurisdiction over all the plaintiffs' claims, based on several exceptions to the FTCA's waiver of sovereign immunity. The Court will address each exception in turn.

#### i.    *Quarantine Exception*

The government argues that the quarantine exception applies to all the plaintiffs' claims. Federal law specifically excepts from the FTCA's waiver "[a]ny claim for damages caused by the imposition or establishment of a quarantine by the United States." 28 U.S.C. § 2680(f). However, based on the Supreme Court's interpretation of the term "quarantine," combined with the legislative histories of both 42 U.S.C. § 265 and the Title 42 Order itself, the Title 42 Order under which the

5

plaintiffs were detained and deported was not a "quarantine," and the quarantine exception does not bar the plaintiffs' claims.

The Title 42 Order allows the federal government "to prohibit, in whole or in part, the introduction of persons and property" into the United States in the interest of public health. At the time of the events alleged in the Complaint, the Order served to "suspend the introduction" of "persons traveling from Canada or Mexico . . . who would otherwise be introduced into a congregate setting," without regard for whether they actually suffered from any infectious disease. *See* 85 Fed. Reg. 65806, 65807 (Oct. 16, 2020). This policy did not require travelers to isolate for a period of days or to test negative for COVID-19 before they entered (or remained within) the country. *Id.* It simply denied them the ability to remain in the United States. *Id.*

Like a quarantine measure, the Title 42 Order may have advanced public health goals by reducing the spread of COVID-19. But a policy is not rendered a quarantine merely because it serves to promote public health by limiting exposure to a disease. Even accepting that "[t]he prevention of disease is the essence of a quarantine law," *Smith v. St. Louis & S.W. Ry. Co.*, 181 U.S. 248, 255 (1901), or that "[t]he right to impose restraints upon the use and disposal of articles found . . . to be injurious to [] health . . . is in the nature of a quarantine regulation,"[2] *Hannibal & St.*

---

[2] Both parties quote *Hannibal* to support the principle that restrictions on movement are characteristic of quarantine laws. However, the quoted passage was lifted from a portion of the decision explaining the lower court's reasoning—which the *Hannibal* Court *overturned*. In fact, *Hannibal* more accurately stands for the principle that a policy restricting movement to guard against infectious disease is *not necessarily a quarantine*.

*J.R. Co. v. Husen*, 95 U.S. 465, 468 (1877), an attribute that is a necessary characteristic for all policies in a given category may not be *sufficient* to identify a given policy as belonging to that category. For example, a policy barring the sale of packaged foods found to contain listeria is a "restraint[] upon the use and disposal of [an] article[] found . . . to be injurious to [] health," and it is essentially designed to prevent the spread of disease. So is a policy designating specific methods of disposal for biological materials in medical facilities. Neither policy is a quarantine.

Indeed, the Supreme Court has acknowledged multiple categories of policies designed to curb the spread of infectious disease—even within the subcategory of policies that specifically addresses community transmission. These laws may follow several distinctive patterns: They can include quarantine and inspection laws, laws barring entry to carriers of a contagious disease, and other "sanitary laws." *See Hannibal*, 95 U.S. at 472. And the Supreme Court has *explicitly* treated laws that bar entry to anyone from a designated place of origin without regard for whether they have an infection as distinct from quarantine laws. *Id.* at 473.

Even if the precise boundaries defining a quarantine are murky—public health crises severe enough to prompt a nationwide quarantine are rare, and modern common law discussion is sparse[3]—most policies considered "quarantines" have consisted of either a period of mandatory isolation or a bar to entry for people or

---

[3] The Court assumes the quarantine exception applies to quarantine restrictions placed on humans as well as non-human "articles." Although there are few modern cases applying the quarantine exception, and most historical decisions addressing the provision concerns agricultural quarantines, the text of 28 U.S.C. § 2680(f) contains no language indicating the exception does not apply to people.

articles that are *demonstrated carriers of disease*—not a comprehensive ban on all travel. *See, e.g.*, *Smith*, 181 U.S. at 258 (health policy was a quarantine when "[s]o far as the record shows, every animal of the kind prohibited . . . may have been actually affected with charbon or anthrax"); *Morgan's Louisiana & T. R. & S. S. Co. v. Bd. of Health of State of Louisiana*, 118 U.S. 455, 459 (1886) (health policy qualified as a quarantine when it permitted officials to board ships, inspect their sanitary conditions, and require any ships or passengers who did not pass the inspection "into quarantine . . . *until the danger was removed*") (emphasis added).

Additionally, the legal basis for the Title 42 Order, which authorizes the executive branch[4] to suspend "entries and imports from designated places" to stop the spread of disease, was designed to authorize public health measures that could *supplement* quarantine policies. *See* 42 U.S.C. § 265. The law, which was enacted in 1944, makes no reference to a quarantine or quarantinable communicable disease. *See id.* Its language exactly mirrors language from its predecessor, a policy originally codified in 1893 that granted the President the "power to prohibit, in whole or in part, the introduction of persons and property" from designated foreign countries to curb the spread of contagious diseases. *Granting Additional Quarantine Powers and Imposing Additional Duties upon the Marine-Hospital Service.*, Chapter 114, 52 Congress, Public Law 52-114. 27 Stat. 449, 452 (1893). The language of the 1893 law described this power as a tool that may be necessary when public health was

---

[4] 42 U.S.C. § 265 originally granted this authority to the Surgeon General. This authority was ultimately transferred to the Secretary of Health and Human Service. *See* 31 C.F.R. 8855 (June 25, 1966); 20 U.S.C. § 3508.

threatened "notwithstanding the quarantine defense"—an implicit recognition that this policy authorized a public health tool that was *distinct* from a quarantine. *See id.*

Similarly, before the Title 42 Order was crafted, existing regulations allowed the federal government to impose foreign quarantines to curb the spread of infectious disease. *See* 42 C.F.R. § 71. Under the existing rules, "quarantine" was defined as the "separation of an individual or group reasonably believed to have been exposed to a quarantinable communicable disease" from the rest of the population to prevent the spread of disease. 42 C.F.R. § 71.1. And the protocols for establishing a quarantine at a port of entry were specifically established: A federal order authorizing quarantine, isolation, or conditional release must be in writing, and it must specifically designate (1) who is subject to the order, (2) "[t]he location of the quarantine or isolation," (3) the factual basis for the order, (4) a statement that the order would be reassessed within 72 hours, (5) an explanation of criminal penalties for violating the order, and (6) an explanation that any medical examination pursuant to the order must be conducted with prior informed consent. 42 C.F.R. § 71.37(a). Even if the Title 42 Order otherwise qualified as a quarantine, it did not meet the requirements for federal quarantines.

The interim final rule, however, created a new public health tool: It introduced provisions to allow for the suspension of introduction of persons into the U.S. *See Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons into United States from Designated Foreign Countries or Places for Public*

*Health Purposes*, 85 Fed. Reg. 16559, 16560 (Mar. 24, 2020) (42 C.F.R. § 71.40) ("Interim Final Rule"). In the supplementary information for the rule, the Centers for Disease Control and Prevention explicitly acknowledged that the new policy did not qualify as a quarantine—a measure the CDC was already permitted to implement. *Id.* According to the background information attached to the rule, "current regulations permit CDC to quarantine or isolate persons entering the United States, but they do not address the suspension of the introduction of persons into the United States." *Id.*

Indeed, the Interim Final Rule repeatedly distinguished between quarantine regulations and the new rule's provisions. It was crafted on the rationale that "[f]ederal quarantines or isolations of all [covered] persons pending test results would be impracticable." Interim Final Rule at 16565. Members of the armed forces traveling from Mexico or Canada, however, were not subject to the rule because "measures such as quarantine" were considered sufficient to prevent their transmission of COVID-19 once in the U.S. *Id.* at 16564. Nor were U.S. citizens or permanent residents barred from entry—again, because "CDC believes that, at present, quarantine, isolation, and conditional release, in combination with other authorities" were sufficient to mitigate the risks posed by these travelers. *Id.*

The supplementary information that accompanied the Interim Final Rule, issued in September 2020, also drew a clear distinction between "quarantine" policies and the suspension of introduction the new rule allowed. The CDC explained the policy rationale for the rule: "Federal Orders requiring the quarantine, isolation, or

conditional release of persons arriving into the United States . . . may be inadequate" to curb the spread of COVID-19, and new measures allowing the CDC to suspend introduction to the U.S. would provide a different and more effective tool. *See Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right to Introduce and Prohibition of Introduction of Persons into United States from Designated Foreign Countries or Places for Public Health Purposes*, 85 Fed. Reg. 56424, 56426 (Sept. 11, 2020) (42 C.F.R. § 71.40). The CDC emphasized the "practical limitations" of quarantine measures to protect populations of thousands, and it explained that "[f]ederal quarantine and isolation require substantial resources and are not sustainable for extended periods of time." *Id.* Additionally, the CDC described "recommendations to self-isolate or self-quarantine" pursuant to a conditional release order as "inadequate." *Id.* There would have been no need to distinguish between the new "suspension of the right to introduce" rule and already-permitted quarantine measures if the new rule had simply been a type of quarantine.

In summary, the very documents supporting the Title 42 Order recognized that the rule was not a quarantine. Therefore, the Court finds that the quarantine exception does not defeat subject matter jurisdiction in this case.

### ii.    *Foreign Country Exception*

The government argues that the plaintiffs' false imprisonment claims (Counts I and II), negligence claims based on expulsion into dangerous conditions (Count IV), and IIED claims (Count VII) are barred by the foreign country exception, because they arose in Mexico. Under the foreign country exception to the FTCA, the U.S.

retains its sovereign immunity against "[a]ny claim arising in a foreign country." 28 U.S.C. § 2680(k). Because Congress enacted this rule in large part to avoid subjecting the United States to foreign tort law, the exception means that no plaintiff can bring a claim under the FTCA for "harm or injury" that occurred in a foreign country. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 703, 705, 707–08 (2004). Courts generally consider an injury to have taken place in "the place where the harmful force takes effect upon the body" or the place where "the last event necessary to make an actor liable for an alleged tort" occurred. *Id.* at 705–06, 705 n. 3 (emphasis removed).

Counts I and II allege that A.M.B.G. and Plaintiff Guzman Martinez, respectively, were physically present in the U.S. for most of the time they suffered false imprisonment, so the foreign country exception does not bar jurisdiction over either claim as it relates to that time. The plaintiffs also attempt to allege that they suffered harm in Mexico. *See* ECF No. 1 ¶ 53 (alleging the plaintiffs were expelled without money, a phone, or A.M.B.G.'s birth certificate). But "the last event necessary" to support liability against the government for false imprisonment occurred in the United States. *See id.* ¶¶ 32–33 (immigration agents "apprehended" Plaintiff Guzman Martinez the first time and "placed [her] in [a] cell[]"); *id.* ¶¶ 43–47, (agents "placed [Plaintiff Guzman Martinez] in one of their vehicles," transported her to the hospital, and "stood guard outside [her] hospital room" while she gave birth

to A.M.B.G.). Therefore, the foreign country exception does not apply to Counts I or II even if the claims were construed to include some harm suffered in Mexico.[5]

Likewise, any harm alleged in Counts IV or VII that was experienced in Mexico because of the plaintiffs' expulsion was suffered because immigration agents removed the plaintiffs from a position of relative safety in the U.S. by expelling them to a place where they had few if any resources or connections.[6] In the absence of a clear rule from the Fourth Circuit, the Ninth Circuit's reasoning—that harm caused by a removal and deportation is harm suffered in the U.S.—is persuasive. *See Arce v. United States*, 899 F.3d 796, 801 n.5 (9th Cir. 2018). Therefore, the foreign country exception does not bar Counts IV or VII.

---

[5] The Complaint appears to assert that the plaintiffs' false imprisonment continued while they were in Mexico. ECF No. 1 ¶¶ 59 (immigration agents "confined . . . A.M.B.G. following her birth . . . and continuing through . . . her period of expulsion in Mexico"), 67 ("during the time [Plaintiff Guzman Martinez] spent in Mexico after her expulsion, she was confined to Mexico"). Based on the allegations presented, the Court cannot reasonably infer that the U.S. government took any action in Mexico to keep the plaintiffs confined there. *See id.* ¶¶ 38, 58 (alleging immigration agents left the plaintiffs at the border, not that they crossed into Mexico with the plaintiffs). Insofar as any such action in Mexico occurred, a claim based on that action would be barred by the foreign country exception to the FTCA's waiver of sovereign immunity.

[6] Here, too, the Complaint contains no allegations about the government committing any acts in Mexico. Thus, insofar as any such action occurred in Mexico, a claim based on that action would be barred by the foreign country exception.

13

### iii.    *Discretionary Function*

#### a.    *Count II: False Imprisonment of Plaintiff Guzman Martinez*

The Court lacks subject matter jurisdiction to adjudicate Count II, pursuant to the discretionary function exception to the FTCA. Under the discretionary function exception, a plaintiff cannot bring any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). To determine whether this exception applies, the Fourth Circuit instructs courts to use a two-step analysis. *See Sanders v. United States*, 937 F.3d 316, 328 (4th Cir. 2019). First, courts must "determine whether the conduct at issue 'involves an element of judgment or choice.'" *Id.* (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). Second, courts consider whether the decision was one "based on considerations of public policy;" that is, a decision "grounded in social, economic, and political policy." *Id.* (citations and quotes omitted).

Both times Plaintiff Guzman Martinez was detained and expelled, she was detained and expelled pursuant to the CDC's Title 42 Order to "suspend the introduction" of "persons traveling from Canada or Mexico . . . who would otherwise be introduced into a congregate setting," as updated October 16, 2020. 85 Fed. Reg. 65806, 65807 (Oct. 16, 2020). The Order applied to all "persons traveling from Canada or Mexico," with limited exceptions. *Id.* None of the specific exceptions—for U.S. citizens and permanent residents, military members and their families, foreign

nationals with valid travel documents, and certain people from countries in the visa waiver program—applied to Plaintiff Guzman Martinez. *See id.*

Immigration agents *could* have allowed Guzman Martinez to remain in the United States under a humanitarian exception to the Order based on her pregnancy, which dealt with "persons whom customs officers determine, with approval from a supervisor, should be excepted based on the totality of the circumstances, including consideration of significant . . . humanitarian . . . interests." [7] *See* 85 Fed. Reg. 65806, 65807 (Oct. 16, 2020). However, they were not required to do so. *See id.* This provision merely gave immigration agents the discretion to grant "case-by-case, individualized exceptions." *Id.* The agents therefore relied on their own judgment when deciding, one case at a time, whether to pursue an exception to the Title 42 Order based on humanitarian concerns.

Additionally, this decision was one "based on considerations of public policy." *Sanders*, 937 F.3d at 328. Removing a migrant like Plaintiff Guzman Martinez—a woman in her third trimester of pregnancy or in her first few days postpartum—raises obvious humanitarian concerns. But allowing her to remain in the United States in mid-2021, during the COVID-19 pandemic, raised concerns related to public

---

[7] Had Plaintiff Guzman Martinez crossed into the United States while pregnant only a few months later, this analysis may have looked different. As the plaintiffs point out, the CBP issued guidance in August 2021, acknowledging the reality that people who are pregnant or postpartum have specific health and wellness needs that require special care in custody and "may weigh in favor of an exception" from the Title 42 Order. *See* ECF No. 1-1 at 66 (Memorandum from the CBP on Pregnancy and Childbirth Guidance, Aug. 18, 2021).

health: Even if she was not initially suffering a COVID infection, she could have been exposed to the virus in detention. Perhaps the CBP's August 2021 guidance regarding pregnant people in custody would have bound the agency to address these concerns with more compassion for Guzman Martinez. But the guidance was updated for policy reasons. And the decisions immigration agents made were also grounded in policy—albeit policy at the individual level.

The plaintiffs contend that once Plaintiff Guzman Martinez expressed fear of torture in Mexico, immigration officials had no discretion to detain and expel her in the manner they did. But the discretionary function exception also bars subject matter jurisdiction based on this theory, because whether a person's expression of fear exempts them from the Title 42 Order is a discretionary decision.

Executive guidance dictated that the decision whether to apply the Order to an individual should be based on immigration agents' "belie[fs]" about whether "it is more likely than not" that the Order applies—a determination agents should make based on their "training, experience, physical observation, technology, questioning[,] and other circumstances." ECF No. 1-1 at 36. In other words, the decision whether someone should be excepted from the Order was discretionary. And contrary to the plaintiffs' contention, supervisory approval was required for any decision to *not* apply the Title 42 Order to an individual—not for a decision *to* apply the Title 42 Order to a person determined (based on discretion) to be subject to the Order. *See id.* at 37 (authority to decide that a subject is "*no longer [] amenable* under [the] Title 42 CDC

Order" must be made by the "Chief Patrol Agent and cannot be delegated below the Watch Commander position") (emphasis added).

For these reasons, the Court concludes that the discretionary function exception deprives it of subject matter jurisdiction over Count II.[8]

> b.    *Count IV: Negligence—Expulsion of Both Plaintiffs into Risky Conditions*

The government had authority to expel Plaintiff Guzman Martinez under the Title 42 Order. While humanitarian considerations weighed against expelling Plaintiff Guzman Martinez and her two-day-old infant to a country where she had few if any resources or connections, the immigration agents who interacted with her were not bound to allow her to stay in the U.S. Instead, they were permitted to allow her to remain in the U.S. under an exception to the Title 42 Order. *See* ECF No. 1-1 at 36 (permitting agents to determine, based on their "training, experience, physical observation, technology, questioning[,] and other circumstances," whether that exception applied). Their actions therefore involved an element of judgment or choice, which required weighing humanitarian concerns specific to Plaintiff Guzman Martinez against other policy priorities, including questions of public health.

---

[8] Additionally, Plaintiff Guzman Martinez does not allege facts sufficient to show that her detention was not pursuant to lawful authority, so she fails to state a claim for false imprisonment in either Texas or Arizona. In both states, false imprisonment requires a plaintiff allege they were detained without lawful authority. *Sears, Roebuck & Co. v. Castillo*, 693 S.W.2d 374, 375 (Tex. 1985); *Cullison v. City of Peoria*, 584 P.2d 1156, 1160 (Ariz. 1978). Plaintiff Guzman Martinez was detained pursuant to the CBP's authority under the Title 42 Order, so she fails to make out this element of her claim. Therefore, Count II will be dismissed under Fed. R. Civ. P. 12(b)(1) and (6).

Accordingly, the actions that form the basis of Count IV as to Plaintiff Guzman Martinez fall under the discretionary function exception to the FTCA, and Count IV will be dismissed for lack of subject matter jurisdiction.[9]

### iv.    *Detention of Goods*

The plaintiffs do not dispute that the detention of goods exception to the FTCA's waiver of sovereign immunity bars Count V. *See* 28 U.S.C. § 2680(c) (excepting from the FTCA waiver "[a]ny claim arising in respect of . . . the detention of any goods, merchandise, or other property by any officer of customs or excise or any other law enforcement officer"). Because this claim arises explicitly out of immigration agents' "fail[ure] to return all belongings" agents had confiscated from

---

[9] Count IV also fails to state a claim as to A.M.B.G. because the Complaint does not allege that the infant suffered harm as a result of her expulsion to Mexico. To state a negligence claim in Texas, a plaintiff must allege "the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach." *IHS Cedars Treatment Center of DeSoto, Texas, Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004). However, while the Complaint contains the conclusory statement that the plaintiffs "suffered damages," it never asserts that that A.M.B.G. experienced any specific harm. ECF No. 1 ¶ 80. Although A.M.B.G. may have been "at[]risk," a risk that does not come to fruition is not harm sufficient to raise a claim for negligence. *Id.* ¶ 79.

The Complaint's omission of allegations about harm to A.M.B.G. is glaring because it would have been easy to allege harm in *some* form—*e.g.*, the baby did not get sufficient nutrition, contracted a cold, could not sleep, or even suffered emotional distress. But nothing of the sort appears in the Complaint. Therefore, Count IV will be dismissed under Fed. R. Civ. P. 12(b)(1) and (6).

However, while the Court cannot reasonably infer harm from *no* factual allegations, it seems likely that the plaintiffs *could* allege harm that would satisfy Fed. R. Civ. P. 12(b)(6) as to a Texas negligence claim on behalf of A.M.B.G. Therefore, the Court will permit the plaintiffs to seek leave to amend Count IV as to A.M.B.G. only, to add such allegations.

Guzman Martinez, the Court will dismiss Count V under Fed. R. Civ. P. 12(b)(1). ECF No. 1 ¶ 86.

## B.    Failure to State a Claim

The Court will now consider whether the claims that survive Fed. R. Civ. P. 12(b)(1) scrutiny adequately state a claim on which relief can be granted. The FTCA generally permits recovery for injuries "caused by the negligent or wrongful act or omission of any employee of the [g]overnment while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). So courts look to state law to define the elements of specific FTCA claims.

### i.    *Count I: False Imprisonment of A.M.B.G.*

Under the FTCA, "[t]he United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Here, the plaintiffs allege A.M.B.G. was falsely imprisoned in Texas. Texas law provides a cause of action against a private individual for false imprisonment if they "(1) willful[ly] det[ain another person] (2) without consent[] and (3) without authority of law." *Sears, Roebuck & Co. v. Castillo*, 693 S.W.2d 374, 375 (Tex. 1985).

The Complaint plausibly alleges that immigration officials willfully detained A.M.B.G. at least when they took her to a CBP facility two days after she was born. ECF No. 1 ¶¶ 49–52. And the allegation that the child was confined "against the will

of her mother" gives rise to the reasonable inference that A.M.B.G.'s detention was without consent. *Id.* ¶ 60.

As far as this Court can tell, neither the Supreme Court nor the Fourth Circuit has recognized any special conditions under which it is lawful for immigration officials to detain a U.S.-citizen child when they detain the child's non-citizen parent.[10] Therefore, the Court concludes that the binding law governing immigration detention applies to all people, regardless of age.

Just like in the criminal context, immigration officials "must have a reasonable suspicion" to justify detaining a person to investigate their citizenship status, and "any further detention . . . must be based on . . . probable cause." *U.S. v. Brignoni-Ponce*, 422 U.S. 873, 881–82 (1975). The Court can reasonably infer that the immigration agents knew for certain that A.M.B.G. was a United States citizen, because they maintained custody of her mother while the child was born in a Texas hospital. *See* ECF No. 1 ¶¶ 47–48. So there could never have been reasonable suspicion to detain A.M.B.G. to investigate her status, much less probable cause to

---

[10] The Fifth Circuit has concluded that law enforcement may detain a child without their parent's consent when they detain the adults responsible for the child under lawful authority, where law enforcement "ha[s] no choice available to them except to remove [the minor] from danger and care for them until they [can] be restored to [the] care and custody [of the lawfully detained adults]." *Witherspoon v. United States*, 838 F.2d 803, 807 (5th Cir. 1988). But here, A.M.B.G. was not temporarily detained in order to protect her from danger—the Complaint plausibly alleges she was detained and expelled in her own right. *Compare Witherspoon*, 838 F.2d at 807 (law enforcement "returned" the minor children to the home where their parent was arrested "when the dangerous conditions there had subsided") *with* ECF No. 1 ¶¶ 51, 53 (child expelled along with her mother, who was told "*A.M.B.G.* would have to return to Mexico") (emphasis added).

continue detaining her for "an hour or two at the CBP facility" after she was discharged from the hospital. *Id.* ¶ 50. Additionally, the Fourth Circuit seems to recognize a U.S.-citizen child's right to remain in the United States without a parent. *Cf. Niang v. Gonzales*, 492 F.3d 505, 512 (4th Cir. 2007) (affirming denial of a parent's removal cancellation claim whose basis was the parent's fear that her U.S.-citizen child would be harmed in the parent's country of origin, because the child "could remain in the [United States], albeit without [the parent]"). Because it appears on the face of the Complaint that the immigration officials had no reasonable suspicion that A.M.B.G. was a non-citizen, Count I plausibly alleges she was detained "without authority of law." *Castillo*, 639 S.W.2d at 375. Therefore, the Complaint adequately states a claim under Count I.

### iii. Count III: Negligence—Expulsion of Plaintiff Guzman Martinez Without First Seeking USCIS Review of Her Fear Claim

Count III seeks damages in negligence for CBP's failure to grant Plaintiff Guzman Martinez a credible fear interview before twice expelling her from the United States. However, there is no analogous local state law beyond ordinary negligence under which Count III could arise, and the Complaint fails to state a claim for ordinary negligence.

Neither Texas nor Arizona law recognizes a duty to offer a USCIS interview to a migrant who makes a credible claim of fear, before expelling them from the United States But even if both states did have such a local law under which Plaintiff Guzman Martinez could seek recovery for CBP not granting her a USCIS fear interview—and

even if this Court viewed her claim as part of the agency's responsibility to her as a person in CBP custody—Plaintiff Guzman Martinez does not plausibly allege that such a duty was triggered.

Any duty to offer a USCIS interview would presumably be based on then-existing executive guidance about the conditions under which such interviews were to be granted. *See generally* ECF No. 1-1 at 36–39. While the Complaint alleges Plaintiff Guzman Martinez told immigration agents that "she was afraid of being sent back to Mexico and wanted to apply for asylum," it does not allege that Plaintiff Guzman Martinez said she feared persecution or torture in Mexico.[11] ECF No. 1 ¶ 51. Plaintiff Guzman Martinez's general expression of *fear* does not plausibly constitute "an affirmative, spontaneous and reasonably believable claim that [she] fear[ed] being *tortured*" that could have required immigration agents to refer her for a credible fear interview with USCIS under the COVID-19 CAPIO. ECF No. 1-1 at 39 (emphasis added). Because the Complaint does not allege that Plaintiff Guzman Martinez made the kind of claim that would trigger a USCIS interview, Count III fails to state a claim that immigration agents were negligent for failing to offer her such an interview. So the government's motion will be granted as to this count.

---

[11] It is unsurprising that Plaintiff Guzman Martinez, a young woman who was eight months pregnant when she was first deported and the mother of a newborn baby the second time, would fear being expelled across an international border into a country where she had no food, no money, and few if any connections. In fact, these predictably frightening and destabilizing circumstances could have spurred immigration agents to pursue a humanitarian exception to the Title 42 Order for her. Instead, CBP expelled Plaintiff Guzman Martinez and her infant daughter, only to admit A.M.B.G. and parole Plaintiff Guzman Martinez into the U.S. the following day. ECF No. 1 ¶¶ 3, 54.

### iv.    Count VI: Negligence—Failure to Secure Proper Medical Treatment for Plaintiff Guzman Martinez While in Custody

#### a.    Arizona

In Arizona, the elements of a claim for negligence are "(1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007). Emotional distress is actionable only when it flows from physical harm. *Keck v. Jackson*, 593 P.2d 668, 669–70 (Ariz. 1979); *cf. Coppinger v. Broderick*, 295 P. 780, 781 (Ariz. 1931) ("Physical pain and suffering in consequence of a wrong occasioning an injury are proper elements of damage."). And harm that results from nonfeasance is actionable only when "the obligation to [do something is] absolute, specific[,] and imperative." *Massengill v. Yuma County*, 456 P.2d 376, 379 (Ariz. 1969).

Plaintiff Guzman Martinez alleges emotional harm resulting from the physical conditions she faced in the Arizona detention center. *See, e.g.*, ECF No. 1 ¶¶ 36–37 (describing fear about the safety of her pregnancy due to the conditions of confinement in government custody). In most contexts, the government has no affirmative duty to provide medical care. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). However, when the government holds an individual in custody against their will, the Eighth Amendment and Due Process Clause impose a "duty to provide certain services and care," including "food, clothing, shelter, [] medical care[,] . . . [and] reasonable safety." *Youngberg v. Romeo*, 457 U.S. 307, 317 (1982); *DeShaney*, 489 U.S. at 200. This duty "arises not from the

[government's] knowledge of the individual's predicament . . . but from the limitation which [the government] has imposed on [the individual's] freedom to act on his own behalf." *DeShaney*, 489 U.S. at 200.

Here, the Complaint plausibly alleges the government denied Plaintiff Guzman Martinez food and adequate clothing and failed to provide her with medical care. ECF No. 1 ¶¶ 31–37.[12] Whether those circumstances were severe or sustained enough to violate Constitutional requirements and thereby breach the applicable "standard of care" is a question of fact. *Gipson*, 150 P.3d at 230. But at this stage, the Complant alleges enough to state a negligence claim based on analogy to Arizona law.

### b.    Texas

To state a claim for ordinary negligence in Texas, a plaintiff must similarly allege "the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach." *IHS Cedars*, 143 S.W.3d at 798. But in most cases, purely emotional or mental harm cannot satisfy the damages requirement of this test. *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993). Because Plaintiff Guzman Martinez only alleges mental and emotional harm in Texas, Count VI succeeds only as it relates to

---

[12] According to the Complaint, when Plaintiff Guzman Martinez was detained and expelled in Arizona, she was eight months pregnant and forced to sit in a crowded cell all night in cold, wet clothing, without access to food. ECF No. 1 ¶¶ 31–35. She was so cold that she was in pain. *Id.* ¶ 34. Plaintiff Guzman Martinez "began to feel contraction-like pain and became worried that she was going into labor prematurely." *Id.* ¶ 36. She saw "people working in the [CBP] facility wearing white coats and stethoscopes" whom she believed to be doctors, and she told one of these workers she was pregnant and experiencing contraction-like pain. *Id.* But the worker never followed up with her, and no other medical professional came to see her. *Id.* ¶ 37.

immigration agents' breach of their duty of care to Plaintiff Guzman Martinez as a person in their custody.

A plaintiff may recover for emotional harm in Texas only "in connection with defendant's breach of some other legal duty." *Boyles* at 594; *see also SCI Tex. Funeral Servs. v. Nelson*, 540 S.W.3d 539, 547 (Tex. 2018). Such a duty may stem from a special relationship between the parties. *Boyles*, 855 S.W.2d at 600.

The existence of a legal duty is a question of law for a court to decide. *Mitchell v. Missouri-Kansas-Texas R. Co.*, 786 S.W.2d 659, 662 (Tex. 1990). To determine whether a specific duty exists, Texas courts consider: "(1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person injured; and (3) public policy considerations." *Tex. Home Mgmt. v. Peavy*, 89 S.W.3d 30, 34 (Tex. 2002). Applying those factors, Texas courts have found that the relationship between guards and people in their custody is a special relationship that gives rise to special duties. *See Salazar v. Collins*, 255 S.W.3d 191, 200 (Tex. App. 2008).[13]

Here, the plaintiffs assert the government's duty stemmed from immigration agents' responsibilities to Plaintiff Guzman Martinez while she was in their custody.

---

[13] The Texas Supreme Court has not directly addressed whether the relationship between guards and people in their custody specifically creates a duty to avoid causing emotional harm. *See Aguilar v. United States*, No. 1:16-cv-048, 2017 WL 6034652 at *3 (S.D. Tex. June 7, 2017). In that context, and with limited analysis, the Southern District of Texas declined to find that guards owed a duty to avoid causing mental damages to people in their custody. *Aguilar*, 2017 WL 6034652, at *3. The *Aguilar* court's conclusion is not binding, and this Court is not persuaded that it is correct. Instead, this Court is required to look to the decisions of Texas *state* courts to predict how the Texas Supreme Court would decide this issue. *Knibbs v. Momphard*, 30 F.4th 200, 213 (4th Cir. 2022).

*See* ECF No. 1 ¶¶ 90–94; *see also* ECF No. 14 at 24–25. And the factors identified in *Peavy* support a finding that guards or other law enforcement officers owe a duty to avoid causing severe mental anguish to people in their custody. First, government officers exercise a relationship of significant physical control over the people in their custody. Second, it is reasonably foreseeable that a person in custody, especially if they are a member of an otherwise vulnerable population, could experience extreme mental stress if their guards refuse to allow them access to ordinary clothing, shoes, or medical care.

Only the last factor, considerations of public policy, weighs in both directions. True, a finding that CBP owes a duty to avoid causing extreme emotional distress to vulnerable migrants in its custody could lead to an increase in litigation. However, such a finding would also encourage immigration agents to take more care in ensuring they adhere to basic standards designed to create humane custodial conditions. The United States is already insulated against litigation for discretionary actions by government officials. Migrants would still be able to bring suit only if immigration agents breached their own nondiscretionary protocols. And any plaintiff would still need to prove they had suffered harm, even if that harm was purely emotional. On balance, then, all three factors weigh in favor of a finding that immigration agents owe a duty to avoid causing mental harm by breaching CBP's own standards.

Specifically, Plaintiff Guzman Martinez alleges that immigration agents had a responsibility to ensure she had access to the medication she was prescribed while

26

she was in CBP custody. ECF No. 1 ¶¶ 91–92. She also alleges that she and her daughter were members of a vulnerable population. And while most CBP guidance Plaintiff Guzman Martinez cites for this claim was enacted after she was last detained and expelled in 2021, she also references the CBP's "National Standards on Transport, Escort, Detention, and Search," dated October 2015. ECF No. 1-3 at 10–40. Under these standards, a person may be an "at-risk detainee" if they are pregnant or nursing, and officers are directed to give special consideration to persons with this "at-risk" designation—including by specifically considering their "physical or mental health concerns." *Id.* at 23.

Plaintiff Guzman Martinez alleges that in Texas, immigration agents forced her to leave the hospital barefoot, without access to her prescription medications, two days after giving birth. ECF No. 1 ¶¶ 49–51. Plaintiff Guzman Martinez remained barefoot for hours while she traveled to the CBP facility and went through processing, and she was sent outside barefoot to wait for transportation to Mexico; she was only given shoes after "crying and begging to be allowed to stay" in the U.S. ECF No. 1 ¶¶ 49–51. Based on these allegations, Plaintiff Guzman Martinez adequately pleads that immigration agents failed to attend to her physical and mental health needs and that she suffered emotional distress.

### v.    *Count VII: Intentional Infliction of Emotional Distress as to Both Plaintiffs*

Plaintiff Guzman Martinez adequately alleges an IIED claim based on harm she suffered in both Arizona and Texas, but Count VII is insufficient as to A.M.G.B. because the Complaint does not include allegations that A.M.B.G. experienced any emotional distress. Both Texas and Arizona recognize claims for intentional infliction of emotional distress as described in the Restatement (Second) of Torts. *See GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 611–12 (Tex. 1999); *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (Ariz. 1987). To bring such a claim, a plaintiff must allege "(1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the actions of the defendant caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." *GTE Southwest*, 998 S.W.2d at 611; *see also Ford*, 734 P.2d at 585.

### i.    *Arizona*

At the time Plaintiff Guzman Matinez was detained and expelled, the National Standards on Transport, Escort, Detention, and Search ("National Standards"), as published in 2015, established basic expectations for the conditions of detention in CBP custody. *See id.* ¶ 92; ECF No. 1-3 at 10–40. The National Standards instructed in part that pregnant and postpartum people in custody may be considered "at-risk detainees," and it directed that "pregnant detainees will be offered a snack upon arrival and a meal at least every six hours thereafter, at regularly scheduled meal times." ECF No. 1-3 at 23, 31. The standards also directed immigration agents to "maintain hold room temperature within a reasonable and comfortable range" if the

28

temperature was within CBP control, and they required that "supervisors must ensure" that people in custody had access to a restroom on request. *Id.* at 25.

However, when Plaintiff Guzman Martinez was detained in Arizona, immigration agents allegedly denied her requests for food and provided her only with water and "a small serving of juice" over the course of her approximately nine hours in custody. ECF No. 1 ¶¶ 32, 35. Although she was kept in a cell that was "extremely cold," agents refused to allow Plaintiff Guzman Martinez to change out of her wet clothing into clean clothing she had brought with her, and she became "so cold sitting for hours in wet clothes that she was in pain." *Id.* ¶ 34. Immigration agents also refused to allow her access to a restroom for over an hour, until she "told an agent that she would have to urinate in the cell if not taken to the toilet." *Id.* ¶ 37. And when Plaintiff Guzman Martinez, who was visibly pregnant, told a person working at the CBP facility that she was pregnant and explained she was having pain that resembled contractions, that worker said she would return to examine Plaintiff Guzman Martinez but never did so, and no CBP personnel provided Plaintiff Guzman Martinez with any medical attention. *Id.* ¶¶ 36–37.

These allegations describe deliberate actions, and on a motion to dismiss, the Court declines to find that they were not intentional or reckless. Whether conduct was extreme and outrageous is a mixed question of law and fact, and it is a jury's responsibility to make that determination if "reasonable minds may differ." *GTE Southwest* at 616, 619–20. The allegations in the Complaint—which describe immigration agents ignoring a very pregnant woman's pain and fear and violating

the CBP's own protocols by denying her food and access to a restroom—are sufficient at this stage to assert that the immigration agents' actions were extreme or outrageous.

The Complaint also includes allegations that support a finding that the immigration agents' actions caused Plaintiff Guzman Martinez to experience severe emotional distress. Plaintiff Guzman Martinez was "in pain" because she was so cold, and when she did not receive medical attention after explaining to a worker that she was experiencing contraction-like pain, Plaintiff Guzman Martinez grew "worried about her pregnancy." ECF No. 1 ¶¶ 34, 37. These allegations are sufficient to maintain a claim for IIED at this stage of litigation based on the events that took place in Arizona.

### ii. Texas

In Texas, IIED exists only as a "gap-filler" tort for cases in which no recovery is available under statutory remedies or other "more established torts." *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 446 (Tex. 2004). Here, the plaintiffs raise no statutory claim. While they allege other causes of action, they fail to state a claim on nearly every other theory of liability. In addition to preserving Count VI based on the alleged events in Texas, Plaintiff Guzman Martinez's IIED claim can survive as a theory in the alternative in case it is ultimately determined that immigration agents breached no special duty that would give rise to a negligent infliction of emotional distress.

30

Plaintiff Guzman Martinez alleges immigration agents in Texas prevented her from leaving her hospital room until she was discharged and then required her to leave the hospital barefoot, two days after giving birth. ECF No. 1 ¶¶ 48–51. After Guzman Martinez traveled from the hospital to a CBP facility and spent "an hour or two" at the facility being processed, she was sent outside—still barefoot—to wait for transportation to Mexico. *Id.* Only then, after she told immigration agents that she was afraid of being sent back to Mexico and that she had nowhere to go with her newborn daughter, and after she "began crying and begged the agents to let her remain," did an agent get her a pair of shoes. *Id.* Based on these allegations, Plaintiff Guzman Martinez sufficiently makes out a claim for IIED based on immigration agents' actions in Texas.

The Complaint includes allegations that immigration agents took deliberate actions, and the allegations could support a finding that those actions were intentional or reckless, and extreme and outrageous. Plaintiff Guzman Martinez also sufficiently alleges she experienced severe emotional distress. However, the Complaint does not include allegations that A.M.B.G. experienced any emotional distress. Therefore, the Court will deny the government's motion to dismiss Count VII as to Plaintiff Guzman Martinez but will dismiss this count as to A.M.B.G.

## IV.    CONCLUSION

The government's motion to dismiss (ECF No. 5) is **GRANTED IN PART** and **DENIED IN PART**.

Counts II–V are **DISMISSED**.

The plaintiffs may file a motion for leave to amend Count IV as to A.M.B.G. only, on or before September 24, 2025. The motion must address the requirements of Fed. R. Civ. P. 15.

Count VII is **DISMISSED** as to A.M.B.G.

The following claims survive: (1) Count I, (2) Count VI, and (3) Count VII as to Plaintiff Guzman Martinez.

**IT IS SO ORDERED.**

_____  /s/  _____

Jamar K. Walker
United States District Judge

Norfolk, Virginia
September 10, 2025